IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 3, 2002

**STATE OF TENNESSEE v. DONALD JOHNSON, JR.**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-06093    Bernie Weinman, Judge**

---

**No. W2001-02883-CCA-R3-CD - Filed January 27, 2003**

---

A Shelby County jury convicted the defendant, Donald Johnson, Jr., of first degree murder in perpetration of robbery, and the trial court sentenced him to life. On appeal, this court vacated the judgment of the trial court and remanded for findings relating to the motion to suppress the defendant's statements to police officers. Upon remand, the trial court made additional findings and again denied the motion. Upon reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

A.C. Wharton, Jr., Public Defender; W. Mark Ward, Assistant Public Defender (on appeal); and Phyllis L. Aluko and Michael J. Johnson, Assistant Public Defenders (at trial), for the appellant, Donald Johnson, Jr.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Charles W. Bell, Jr. and Rosemary Andrews, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The defendant was convicted of felony murder for fatally shooting a convenience store clerk during a robbery. After his arrest, the defendant gave an oral statement and a signed, typewritten statement admitting his involvement in the offense. The trial court denied his motion to suppress his statements. On appeal, we remanded the case to the trial court for further findings of fact. *See* State v. Donald Johnson, Jr., No. W2000-00875-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 227, at *15 (Tenn. Crim. App. March 28, 2001, at Jackson), *perm. to app. denied* (Tenn. 2001). Upon making further findings, the trial court again denied the defendant's motion to suppress, and this appeal ensued.

The defendant contends the trial court erred in denying his motion to suppress his oral and typewritten statements to police. He submits he did not knowingly and voluntarily waive his *Miranda* rights prior to making his initial oral statement, and that the oral statement tainted his subsequent typewritten statement.

## I. TESTIMONY AT THE SUPPRESSION HEARING

We set forth the following facts from our prior opinion:

> At the suppression hearing, the arresting officer, Michael J. Clark, testified that he arrested the defendant on November 25, 1997, at 5:11 p.m. The defendant was not given *Miranda* warnings at the time of the arrest. Officer Clark stated that while transporting the suspect to the jail, he offered to stop and get the defendant something to eat or drink, but the defendant declined the offer. Officer Clark testified that the defendant was not questioned on the way to the station and was not questioned at the station until his mother arrived. Although defendant's mother was contacted several times at work after defendant's arrest, she did not arrive at the police department until 10:57 p.m. Officer Clark further stated that he then asked the defendant's mother to speak with the defendant privately. Thereafter, the defendant, with his mother's encouragement, agreed to talk to authorities.

> Officer Clark stated that he gave the defendant, in the presence of his mother, the *Miranda* waiver of rights form, and the defendant read the waiver aloud. He claimed that the defendant had no trouble reading the form; the defendant signed the form at 11:35 p.m.; and the defendant stated that he understood the form and had no questions regarding the waiver of his rights. Furthermore, Clark stated that the defendant did not appear to be under the influence of drugs or alcohol. Officer Clark also indicated that the defendant's mother read the waiver form and said she understood it. Officer Clark testified that, thereafter, he conducted an oral "fact finding interview" which lasted about one and one-half hours.

> After this oral interview, defendant's formal statement was taken at 2:31 a.m. Officer Clark testified that the delay between the two statements was due to the inability to immediately secure a transcriptionist. Officer Clark testified that he read to the defendant the *Miranda* warnings before the typewritten statement was taken, and the defendant indicated he understood the warnings and wanted to give the statement. Both the defendant and his mother signed and initialed each page of the typewritten statement.

Defendant's sister, Shamika Johnson, testified that she was present at the defendant's arrest, and the officers did not verbally advise the defendant of his rights. She claimed that the defendant was not sober at the time of the arrest; her brother could not read very well; and he had trouble comprehending certain words.

Defendant's mother testified that when she arrived at the police department, the defendant was sitting in a room with two officers who kept telling him to "quit lying." She claims that when the defendant started talking, the officer said, "you're lying . . . I don't want to hear that . . . I'm going to get your girlfriend and lock her up and she's going to have a baby in here." She claimed that her son had not yet been advised of his rights. Thereafter, Ms. Johnson entered the room and told her son that she was tired and he needed to tell the truth, or she was going to leave him in jail. She testified that the defendant began crying, and the officers would not allow him to have food or water or go to the bathroom. Ms. Johnson testified that she told the officers she was tired because she had worked from 7:00 a.m. to 10:30 p.m. every night that week.

Ms. Johnson testified that she did not read the waiver of rights form before she signed it and did not see nor hear the defendant read it. She also testified that the defendant "can't read that good" and would not have been able to understand the form if he had read it. She further stated that the defendant had been diagnosed as "somewhat" mentally retarded and claimed that when he becomes agitated, the defendant cannot understand things clearly. Ms. Johnson further testified that neither she nor the defendant read the written statement before signing it, and that the police officer did not read the statement to the defendant. Finally, Ms. Johnson claimed that neither she nor defendant signed a waiver of rights form until after the written statement was typed.

The defendant testified that he was not informed of his rights at the time of his arrest. He claimed the officers began asking him questions before his mother arrived, and the officers got upset and began hitting the table. He testified that once his mother arrived, the officer handed him a piece of paper which he signed without reading it. Defendant further claimed that he smoked marijuana immediately prior to his arrest. With regard to his typed statement, the defendant stated the officer read the questions and answers, and he shook his head yes or no. Defendant further claimed he was not offered anything to eat or drink, not allowed to go to the bathroom, and had not slept for over twenty-four hours.

Dr. Fred Steinberg, a clinical psychologist who evaluated the defendant, found defendant had a verbal I.Q. of 67 and an overall I.Q. of 69, which is in the mildly mentally retarded range. Dr. Steinberg further found the defendant could only read at a second grade level. He concluded that the defendant would be unable to read the waiver of rights form and comprehend what he was reading. However, he also concluded that if someone else read his rights to him, he would be more likely to comprehend them.

The state offered the testimony of Dr. Rebecca Caperton, a psychologist for the Shelby County Juvenile Court. Dr. Caperton testified that her testing revealed the defendant had an I.Q. of 83, which is borderline between the low average and mildly retarded ranges. She testified that it was "questionable" whether the defendant could read his *Miranda* warnings at all, due to his low reading level. Finally, Dr. Caperton stated that she concurred with Dr. Steinburg's finding that the defendant "basically cannot read," but testified that if his rights were explained to him verbally, the defendant would be more likely to understand them. However, Dr. Caperton also testified that even though she would be surprised if the defendant was able to read his rights aloud, she felt that, if he could in fact read, he could "understand verbally what is going on."

The defendant offered rebuttal testimony of Dr. Lynn Zager, who testified that the test administered by Dr. Caperton is not an appropriate indicator of a person's I.Q. Dr. Zager further testified that the mere ability to recognize words does not parlay into an understanding of what those words mean.

Donald Johnson, Jr., 2001 Tenn. Crim. App. LEXIS 227, at **4-9.


## II. STANDARD OF REVIEW

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

### III.  TRIAL COURT'S FINDINGS

No additional evidence was received upon remand.  The trial court issued written findings in which it found the defendant was seventeen years old at the time of the offense, was in the eighth grade, took resource classes, and had a low average to mildly mentally retarded intelligence level. The trial court observed that the defendant seemed to understand all the court proceedings and responded to questions in an "appropriate" manner.  The trial court described Ms. Johnson as an "intelligent and responsible person" and found that she was present when the police officers questioned the defendant.

The trial court specifically accredited the testimony of Dr. Caperton and found the defendant, prior to his oral statement, was able to read the waiver form aloud and understand his *Miranda* rights.  It also considered the Uniform Affidavit of Indigency, which the defendant "was apparently able to read and appropriately respond" to the questions.  Finally, the trial court found that under the totality of the circumstances, the defendant "was made aware of " his *Miranda* rights and voluntarily made the oral statement to police.

The trial court further found a police officer read the *Miranda* warnings to the defendant before he gave the typewritten statement, and that the defendant understood his rights as evidenced by the fact that both he and his mother signed the typewritten statement.

In addition, the trial court found the police officers did not use coercive tactics to obtain the two statements from the defendant; the defendant made the statements after his mother requested that he tell the truth; one and one-half hours elapsed between the two statements; although the police detained the defendant for several hours prior to the interrogation, they were waiting for Ms. Johnson to arrive; and Ms. Johnson was present during the interrogation.

The trial court found the defendant was not mistreated by the police and was offered food, beverages, and the use of restroom facilities.  The trial court noted that the interrogation by the two police officers was not excessively prolonged, and that pursuant to an officer's request, Ms. Johnson spoke privately with the defendant prior to the interrogation.  The trial court found the defendant wanted to tell what happened, and the oral statement was not a psychological factor which caused the defendant to give the subsequent typewritten statement.  Finally, the trial court found the defendant was aware of, and understood, his *Miranda* rights prior to freely and voluntarily giving both statements.

### IV.  ANALYSIS

The defendant contends he did not knowingly and voluntarily waive his *Miranda* rights because he suffers from a mental deficiency, which prevented him from reading and understanding the waiver form.  The fact that one suffers from certain mental deficiencies does not necessarily prevent that person from understanding and waiving constitutional rights.  *See generally*, State v. Middlebrooks, 840 S.W.2d 317, 327 (Tenn. 1992).  A person with a mental deficiency may waive his *Miranda* rights, if that waiver was knowingly and voluntarily made.  State v. Green, 613 S.W.2d

229, 233 (Tenn. Crim. App. 1980). When determining whether an accused has voluntarily, knowingly and intelligently waived his *Miranda* rights, this court must consider the totality of the circumstances which existed when the accused waived these rights. State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000).

The trial court found that the defendant "was made aware of " and understood his *Miranda* rights, and that he voluntarily waived his rights and gave the oral statement to the police. In its findings, the trial court implicitly accredited the testimony of Officer Clark, who stated the defendant read the waiver form aloud and signed it prior to making the oral statement. Officer Clark testified the defendant did not have trouble reading the waiver form, and that the defendant said he understood the form and did not have any questions. The trial court specifically accredited the testimony of Dr. Caperton, who opined that if the defendant read the *Miranda* warnings aloud, he could likely understand them.

The trial court also considered the Uniform Affidavit of Indigency completed by the defendant. However, neither party presented evidence during the suppression hearing concerning the completion of the affidavit. Although the affidavit is in the record, we must agree with the defendant's contention that the record does not reveal the circumstances under which it was completed. A court may take judicial notice of court records in the same case. Delbridge v. State, 742 S.W.2d 266, 267 (Tenn. 1987). However, Tennessee Rule of Evidence 201(b) only permits judicial notice of facts "not subject to reasonable dispute." *See* Neil P. Cohen, et al., **Tennessee Law of Evidence** § 2.01 [4][d] (4th ed. 2000). Although the trial court could take judicial notice of the existence of the affidavit in the court records, the relevant inquiry is the circumstances under which it was completed. These circumstances are subject to reasonable dispute, are not "generally known," and do not qualify as judicially noticeable facts. *See* Tenn. R. Evid. 201(b). Nevertheless, although we conclude the trial court erred in considering the affidavit, the trial court's other factual findings amply support its ruling that the defendant was aware of and voluntarily waived his *Miranda* rights prior to giving the oral statement.

Regardless, we conclude the defendant's subsequent typewritten statement was properly admitted at trial. If law enforcement officials extract an illegal confession from a defendant, there is a rebuttable presumption that a subsequent confession is tainted by the initial illegality, even if the defendant received proper *Miranda* warnings prior to making the subsequent confession. State v. Smith, 834 S.W.2d 915, 919 (Tenn. 1992). However, the prosecution may overcome the presumption by establishing "that the taint is so attenuated as to justify admission of the subsequent confession." *Id.* (citations omitted).

Courts must examine whether the circumstances surrounding the initial illegality prevented the defendant from subsequently making a knowing and intelligent waiver of his rights and voluntarily confessing to his involvement in the offense. *Id.* In deciding whether a subsequent confession is admissible against a defendant, courts should consider the following factors:

> 1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;

2. The temporal proximity of the prior and subsequent confessions;
3. The reading and explanation of *Miranda* rights to the defendant before the subsequent confession;
4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;
5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;
6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;
7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;
8. Whether the defendant initiated the conversation that led to the subsequent confession; and
9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered *Miranda* rights.

*Id.* at 919-20. No single factor is determinative. *Id.*

The trial court found that even if the oral statement should be suppressed, the typewritten statement would still be admissible. The trial court carefully considered each of the factors listed above in making its determination. The evidence does not preponderate against the trial court's findings. We conclude the trial court did not err in making this determination.

Because the trial court properly admitted the subsequent typewritten statement at trial, we conclude in accordance with our prior opinion that even if the trial court erred in admitting the oral statement, it would be harmless. *See* Donald Johnson, Jr., 2001 Tenn. Crim. App. LEXIS 227, at *21. The oral statement was limited compared to the detailed and incriminating typewritten statement. *Id.*

Based upon our review of the record, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE